SOUTHWICK, P.J.,
for the Court:
¶ 1. When Thomas and Eleanor Murphy divorced, both petitioned for custody of their young daughter, Kathleen. The Warren County Chancery Court awarded primary physical custody of the child to Eleanor Murphy. On appeal, Thomas Murphy alleges that the chancellor erred in relying on his former wife’s testimony and that of a physician with whom she had consulted, and that as a result of that defective testimony custody was erroneously awarded. A final issue concerns the division of the husband’s civil service retirement account. We find no error and affirm.
*327 FACTS
¶ 2. Eleanor and Thomas Murphy were married in 1994. Their daughter Kathleen was born in 1996. The couple had marital problems almost from the beginning. In April of 1998, Mr. Murphy returned from a fishing trip and found that his wife had left, taken their daughter, and removed most of the contents of their home. He could not discover their location. Mrs. Murphy returned with Kathleen after a thirty-five day absence, then filed for divorce a few weeks later.
¶ 3. Prior to this divorce, Mrs. Murphy was involved in proceedings for modification of the custody for her son Ben Goins, a child she had with her first husband, Rick Goins. Before the Murphy’s marriage, she had been granted custody of Ben, a decision reached after Rick Goins had disappeared with Ben for about four months during the pendency of their divorce proceedings. When Ben turned fourteen years of age, Rick Goins sought a modification of custody based on Ben’s wish to live with his father. At a hearing about modification, the conditions of the Murphy household became an issue. Young Ben testified that his mother’s then-husband, the appellant Thomas Murphy, got drunk on weekends and maybe once during the week. Ben stated that when he got home from school, he would go to his room and lock the door if Mr. Murphy had been drinking. Mrs. Murphy, however, testified that her husband did not have a drinking problem.
¶ 4. Those statements became an issue in the present divorce. Ben Goins testified that he had seen Mr. Murphy drunk only about three times, that he had not been violent on those occasions, and Ben only surmised that Mr. Murphy drank on the weekends because he saw beer cans in the trash. Mrs. Murphy, after downplaying Mr. Murphy’s drinking in the custody battle over Ben, now testified that her husband had an alcohol problem. She justified that earlier statement by the fact that she knew Mr. Murphy had been tested at a substance abuse clinic and was told that he did not have a problem with alcohol. She now testified that after the custody battle over Ben Goins was concluded, Mr. Murphy’s drinking increased. Mr. Murphy at the hearing in this case denied having a drinking problem, but he admitted to being tested at a clinic.
¶ 5. Mr. Murphy has been employed by the Army Corps of Engineers in Vicksburg for twenty years. Mrs. Murphy, who has a Ph.D in Early Childhood Education, is a school teacher. When their daughter Kathleen was born, Mrs. Murphy decided to remain at home except for two nights per week when she taught at Hinds Community College. Eight witnesses testified that the mother was Kathleen’s primary care giver. Five other witnesses testified that the father was Kathleen’s primary care giver and that, with the exception of the breast feeding that occurred until Kathleen was eighteen months old, he performed most parental tasks.
¶ 6. Each spouse testified to the shortcomings of the other as a person and as a parent. Prior to the divorce, Mr. Murphy had explained his concerns about his wife’s parenting skills with three of Kathleen’s physicians. Those physicians’ reactions became an issue at trial, as did the fact of Mr. Murphy’s explaining these matters to physicians without his wife’s knowledge.
¶ 7. Prior to the final decree, the chancellor granted temporary custody of Kathleen to her mother subject to the father’s visitation. The parents brought Kathleen to the parking lot of a grocery store when visitation was being exercised. Who suggested this arrangement became an issue since Mr. Murphy used the manner of exchange to allow his family and friends to *328 be stationed in the parking lot to observe. Kathleen’s godparents testified that Kathleen did not want to go back to her mother when the father’s visitation ended. Mr. Murphy’s father testified that Kathleen got upset when she was being dressed to go back to her mother, and said “no Daddy. I don’t want to go Daddy.” He further testified that Kathleen cried when Mrs. Murphy resumed custody but did not cry when Mr. Murphy began his visits.
¶ 8. While the divorce was pending, Mr. Murphy telephoned his wife several times late at night. She notified the Vicksburg Police Department. When Officer Bobby Clark arrived at her residence, the telephone was ringing. Officer Clark answered the telephone and told the man on the other end to quit calling. Officer Clark testified that the man’s speech was slurred as if the man had been drinking. Officer Clark testified that he knew the man on the telephone was Mr. Murphy because his name appeared on the caller identification box. That box also indicated that he had phoned five times that night. Mrs. Murphy filed harassment charges as a result of the incident. Mr. Murphy then wrote a letter to her in which he instructed her to drop the charges against him or else he would file “legitimate charges” against her.
¶ 9. The hearing revealed mutual ill will and brought forth varied allegations of parental deceitfulness and general unworthiness. Each spouse hired an expert in psychology or psychiatry to aid in the presentation of the case on custody. Some of that expert testimony will be discussed when reviewing an issue made about that evidence.
¶ 10. The chancellor granted the divorce and made two decisions that are contested on appeal. One is to give custody of the couple’s child Kathleen to Mrs. Murphy. The other disputed decision was to make a purported equitable distribution of Mr. Murphy’s civil service retirement, which for his Army Corps of Engineers position replaced Social Security benefit entitlement, even though Mrs. Murphy’s employment would ultimately entitle her to Social Security benefits.
DISCUSSION

I. & II. The Chancellor’s Reliance on Mrs. Murphy’s and Dr. Hiatt’s Testimony

¶ 11. Mr. Murphy alleges that his former wife perjured herself when she testified in this case that he had a drinking problem after she testified in the Goins matter that he did not. This alleged perjury is also said to have infected the testimony of his wife’s expert witness, Dr. Wood Hiatt. Mr. Murphy argues that this psychiatrist reached his conclusion about Mrs. Murphy’s being the better choice as a custodial parent because she had informed him that her husband had a serious drinking problem.
¶ 12. Mrs. Murphy’s explanation for her divergent testimony in the two cases has already been described. In summary, she understood at the time of the Goins hearing that he had just been tested and found not to have a problem with alcohol, that he had promised to reduce his drinking, and that instead the problem had increased in the one and a half years since the Goins hearing.
¶ 13. Mr. Murphy focused on the drinking and perjury question in a motion to the chancellor for reconsideration. The chancellor entered a second memorandum and order to address the matter. In the order the chancellor cited two cases in which the supreme court held that the chancellor is in the best position to determine a witness’s veracity. Madden v. Rhodes, 626 So.2d 608, 616 (Miss.1993); Mullins v. *329 Ratcliff, 515 So.2d 1183, 1189 (Miss.1987). In her supplemental order, the chancellor said that she “gave consideration to all facets of the evidence, made [her] determination as to the veracity of the witnesses and judged their credibility.”
¶ 14. We find no manifest error in the manner in which the chancellor determined credibility. Regardless of whether the chancellor found Mrs. Murphy’s explanation about her changed view about Mr. Murphy’s drinking completely credible, the chancellor did not substantially rely on this issue. There were numerous witnesses who testified to Mrs. Murphy’s parenting skills and stated that she was Kathleen’s primary care giver. Dr. Hiatt’s testimony was based upon his interview with her and his views on her veracity, together with his personal observation of the interaction that each parent had with their child.

III. Validity of custody decision

¶ 15. The chancellor discussed the Supreme Court case that established factors that a court must consider in evaluating custody. Albright v. Albright, 437 So.2d 1003 (Miss.1983). The chancellor’s opinion is not completely clear as to the reaction that she had to some of the factors. It appears that the Murphys were found equally capable of providing a stable home environment and maintaining their own employment. As to the remaining factors that she discussed, the chancellor simply summarized the testimony relevant to each factor without commenting on which testimony she found to be the most persuasive and without stating which parent the factor favored. The chancellor concluded her analysis by holding that “after weighing all of the Albright factors, the evidence in this ease and considering the best interest of Kathleen, the overall weight of the evidence is in Mrs. Murphy’s favor.”
¶ 16. Mr. Murphy finds several factors clearly to weigh in his favor. He argues that because of his ex-wife’s alleged perjury, she is morally unfit to be the custodial parent. He also points to evidence of Mrs. Murphy’s efforts to interfere with her first husband’s relationship with their son Ben Goins as proof that she will do the same with Kathleen. Dr. Hiatt’s testimony that the stronger bond was between mother and daughter should have been rejected because Hiatt’s testimony was tainted, an issue already discussed.
¶ 17. We should point out that in addition to her statement that Dr. Hiatt testified that the strongest bond was between mother and daughter, the chancellor mentioned that the father’s expert, Dr. Angela Hertzog, testified that the father and daughter were “very connected” and that Mr. Murphy responds to Kathleen compassionately and with unconditional love. The chancellor also found that both parents love their daughter and expressed sadness that Kathleen would not be able to interact with both of her parents on a daily basis. The chancellor was aware of all of this evidence.
¶ 18. We give great deference to a chancellor’s fact-finding. However, we are at something of a disadvantage in reviewing the custody award since the chancellor did not make specific findings on all of the Albright factors. A similar problem arose in another recent appeal. We reviewed a chancellor’s failure to enumerate the Albright factors. The chancellor addressed several of the factors and stated that he had re-read the Albright factors as they related to the facts. The chancellor concluded that the Albright factors favored an award of custody to the father rather than to the mother. Mitchell v. Mitchell, 1999-CA-01343-COA, — So.2d - (Miss.Ct.App. October 24, 2000). We affirmed, *330 finding Supreme Court acceptance of similarly abbreviated treatment of Albright:
The majority of the Mississippi Supreme Court [in Sobieske v. Prestar, 755 So.2d 410 (Miss.2000)] held that while they would have preferred to have had the Albright factors expressly enumerated; nevertheless, when considering the deference that must be shown to a chancellor, it could be inferred by the chancellor’s mention of Albright that he had considered those factors. Therefore, in the present case, in light of the chancellor’s dissertation which is in part enumerated below and his mention of Albright, we too allow an inference regarding the Albright factors that were not addressed.
Mitchell at (¶ 47).
¶ 19. In the present case, the chancellor stated that she analyzed the custody issue based on Albright and concluded that the child’s best interest would be served by the mother’s custody. The chancellor’s failure to make precise findings is not especially significant if we can with confidence state that she considered the proper factors. Given the chancellor’s lengthy recitation of the evidence that she found relevant to each factor, we have such confidence. Finding no threshold reversible error in the manner in which the decision was expressed, though noting that it would be far preferable for precise findings to appear in the chancellor’s opinion, we now turn to Mr. Murphy’s specific factual complaints.
¶ 20. It is true that some evidence was introduced that suggests Mrs. Murphy was uncooperative in permitting her first husband’s interaction with their son Ben. This does not translate into a required finding that she will attempt to thwart Mr. Murphy’s visitation with Kathleen or poison his relations by telling Kathleen negative things about her father. There is in fact some evidence of Mr. Murphy’s failure of cooperative spirit during the time of temporary custody prior to the divorce.
¶ 21. Further, Mr. Murphy has yet to exercise his visitation of Kathleen outside of his parents’ home. It is true that his parents and friends testified that he solely cared for Kathleen, even in his parents’ home, but the fact that he never had the child alone at his own home may have caused the chancellor to weigh Mr. Murphy’s parenting skills less strongly.
¶ 22. Each parent has appeared to succumb to the temptation to create problems for a former spouse with regards to a child, Mrs. Murphy as to Ben Goins and Mr. Murphy as to some of the visitation with Kathleen. The chancellor, faced with both positive and negative information about both parties, exercised her discretion. The chancellor’s decision was supported by substantial evidence, and there was no abuse of discretion.

IV. Civil Service Retirement

¶ 23. Mr. Murphy began contributing to his federal civil service retirement account before his marriage. His contributions to this account are mandatory and they take the place of Social Security contributions. When he retires, he will receive payments from this account in lieu of Social Security. The chancellor awarded Mrs. Murphy 33% of $13,000, the amount that his federal retirement account increased during the marriage. Mr. Murphy does not believe that his retirement account is marital property because his wife made no contributions to the account.
¶ 24. The Supreme Court has held that federal civil service retirement is a marital asset subject to equitable distribution. Traxler v. Traxler, 730 So.2d 1098 (Miss.1998). In Traxler, the husband’s federal civil service retirement account increased *331 by $46,000 during the marriage; he would not be entitled to Social Security benefits when he retired. The wife’s non-civil service retirement account had grown by $19,000 during the marriage, and in addition, she would be eligible for Social Security benefits upon her retirement. The chancellor in Traxler considered the amount that the husband’s civil service retirement accumulated during the marriage as a marital asset but did not allocate any portion of it to Mrs. Traxler. Id. at 1102. The Traxler court addressed the husband’s argument that the chancellor failed to include the wife’s future Social Security eligibility as part of equitable distribution. The court held that this was an error, but affirmed because it found the overall distribution equitable. Id. at 1103.
¶ 25. In the present case, the chancellor considered the amount that Mr. Murphy’s retirement increased during the marriage to be a marital asset. That was necessary under Traxler. The chancellor also considered Mrs. Murphy’s future eligibility for Social Security benefits as marital property. That also is correct under Traxler. The parties, though, had failed to give the chancellor a value for that eligibility.
¶ 26. Taking the evidence that the parties had given her, the chancellor made the most equitable distribution that she could. Mr. Murphy was awarded assets totaling $58,906.55 while Mrs. Murphy received marital assets totaling $51,852.13. Because the chancellor awarded to Mr. Murphy about $7,000 more than to his ex-wife, allowances for Mrs. Murphy’s valuable but unvalued Social Security eligibility may have been made. Regardless, we find that the overall distribution of the marital property was equitable, including the civil service retirement allocation.
¶ 27. THE JUDGMENT OF THE WARREN COUNTY CHANCERY COURT GRANTING CUSTODY OF THE MINOR CHILD TO APPELLEE AND DISTRIBUTION OF MARITAL ASSETS IS AFFIRMED. ALL COSTS ARE ASSESSED TO APPELLANT.
McMILLIN, C.J., KING, P.J., PAYNE, BRIDGES, THOMAS, LEE, IRVING, MYERS AND CHANDLER, JJ„ CONCUR.